### KUHN v BANKER

Ohio Appeals, 9th Dist, Summit Co

No 2791. Decided March 12, 1937

N. M. Greenberger, Akron, W. A. Spencer, Akron, and Fred Ormsby, Akron, for appellant.

R. H. Nesbitt, Akron, for appellee.

## OPINION

By DOYLE, J.

Reference will be made to the parties under the titles which they bore in the trial court.

This is an appeal on questions of law from a judgment rendered in the Court of Common Pleas, which court directed the jury, at the conclusion of plaintiff's case, to return forthwith a verdict for the defendant. Upon this verdict final judgment was rendered for the defendant. The plaintiff below has appealed.

The action was predicated upon the alleged malpractice of the defendant, a physician and surgeon practicing in Akron. It was claimed that said defendant was employed by the plaintiff to treat her, in his professional capacity as such physician and surgeon, for a fracture of the femur in the region of the neck of said bone. A fall had caused the injury.

The claimed malpractice was the failure of the doctor "to put the bone or bones of said leg properly in apposition, * * * to use the proper appliances at the proper time in the treatment * * *, and * * * in not measuring and thoroughly examining and properly treating the leg * * *."

The record evidence submitted by the plaintiff disclosed that she was a woman of 55 years of age; that the fractured femur was sustained December 18, 1932; that the defendant surgeon was employed the following day; that she was immediately sent to a hospital, where X-ray films were made, which films showed a fracture of the neck of the femur; that there was then applied a "Thomas splint" with traction, for the purpose of reducing the fractured parts to proper apposition and to permit their healing with good alignment; that on December 23, 1932, X-rays were again taken, which showed good alignment and position of the fractured parts; that again on January 13, 1933, X-rays were taken, which indicated excellent position of the fractured bone and a natural bony union of the broken ends; and that on January 23, 1933, the "Thomas splint" was removed, a basket splint applied, and the plaintiff released from the hospital and taken home.

The record evidence further disclosed that the defendant visited plaintiff from time to time at her home, and on February 6, 1933, removed the basket splint, at which time he suggested that she attempt to walk with assistance; that on

occasions she attempted to follow the suggestion and each attempt was fraught with pain; that she told the defendant the bones were not united and that she could feel a grating sensation in the region of the fracture when walking was attempted; that her condition did not improve and no suggestion was made to have X-rays taken again, nor did the defendant make any further suggestions for her welfare other than to tell her to walk; anl that he continued to see her until the latter part of March, 1933.

From this point on the record discloses no further attention by the defendant. On or about June 15, 1933, she visited the Akron Clinic, where X-rays were taken. These X-rays disclosed a distinct nonunion of the fracture, and the ends of the fractured femur not in proper apposition.

On the 26th of July, 1933, she went to a hospital in Cleveland, and was there operated by an eminent orthopedic surgeon, who removed the head of the femur, rounded off the end of the remaining fragment, and ankylosed the joint. The plaintiff now has a permanent disability.

The only expert witness offered by the plaintiff was the orthopedic surgeon who operated her in Cleveland, and his testimony is decisive of this case.

There is almost a unanimity of opinion of courts in the United States that recovery of damages by a litigant on account of the negligence of a physician must be predicated, first, upon proof of negligence, and, second, upon proof that such ▮▮▮▮▮ negligence was the proximate cause of the injuries for which redress in damages is sought. And further, that a prima facie case of negligence on the part of a physician, in and of itself, is not sufficient to sustain the action. **Craig v Chambers, 17 Oh St 253.** 59 A. L. R. 884, Annotation. Ewing, et v Goode, 78 Fed. Rep. 442 (Opinion by William Howard Taft, Circuit Judge), wherein it was stated, at page 443 of the opinion:

"Before the plaintiff can recover, she must show by affirmative evidence—first, that defendant was unskilled or negligent; and, second, that his want of skill or care caused injury to the plaintiff. If either element is lacking in her proof, she has presented no case for the consideration of the jury."

Plaintiff's said witness, the orthopedic surgeon, recited to the jury the way of nature in healing broken bone. In brief, he testified that when a bone is broken, the broken ends have a tendency to bleed which first causes a fibrous union if the ends are within a reasonable distance of each other, and then nature, through the medium of a lime deposit, creates a bony union. This bony union after the healing "with a new deposit of bone, both inside and outside, around the fracture, * * * is stronger than the bone about it, the unbroken bone that had never been broken above it, because there is more bone." The doctor testified:

"Q. In the absence of any great blow or personal injury to the person of the one having that bone union, the only way the bone union could disappear would be by absorption, is that right?

"A. Yes."

The doctor further testified that a bony union, following a break in the immediate region of a joint, as in the instant case, was susceptible of being dissolved by a solvent thrown out by the body.

"Q. Now, then, once this union does occur between the fragments of the bone, does that bone ever become absorbed by the blood?

"A. It is well known that that particular fracture under discussion does, and we think it is the fluid in the hip joint that causes it.

"Q. You say to the jury that it is your opinion that the fluid has a tendency to absorb a bony union that has once occurred?

"A. I wouldn't want to put it like that, but those who have experimented and written along these lines claim that the absorption of a bony union, which we know by X-ray in certain cases, has occurred, in this particular locality,—certain men who have written along these lines believe this fluid that bathes these parts, absorbs that callus."

There is an entire absence of evidence of negligence of the defendant up to the 6th of February, 1933. The last X-rays showed the bones in perfect alignment and a bony union. The plaintiff's expert witness testified in substance that the examination by means of X-ray, and the treatment, care and steps taken, were in compliance with the approved standard practice in this locality. The acts of omission and commission of the defendant, as disclosed by the plaintiff's witnesses, from this point on, are, we believe, sufficient in ▮▮▮▮▮ law to be considered at least a prima facie case of negligence. The doctor's testimony follows:

"Q. Now, assuming, doctor keeping in mind that she left the hospital on the 23rd, when the method of treatment was changed from the ring and the pulley appliances to the shorter appliance, and that the doctor visited her on or about the 6th of February, and this cast or splint, whatever was put on, were removed and she was told to walk, that in a day or two she attempted to walk, that within a day or two after that, she saw the doctor and she complained that she could feel a grating of the bone in attempting to walk; that thereafter the doctor called on her, in perhaps a week again and she again complained, to the doctor, that the bones were—that she did not believe the bones were in place, that she could feel the bones grating, and that she suffered great pain,—in your judgment, in your opinion, what would have been the common, ordinary, and accepted and proper practice or thing to do, at that time? "* * *

"A. * * * under those conditions, an X-ray should be taken to see the condition of the bones.

"Q. And what, if anything, after that?
"A. It depends upon what your X-ray and your clinical examination would show."

There is no way of ascertaining from the evidence when the disunion occurred. The X-rays of January 13, 1933, showed a bony union. None were again taken until June, when there was disclosed a disunion.

Was it negligence under the circumstances to instruct her, 26 days after the X-ray showed a perfect bony union, to walk? Was the defendant's failure to further X-ray the patient, and was his subsequent treatment, of such a nature as to evidence prima facie negligence?

We think it was sufficient to establish prima facie negligence, in view of both lay and expert evidence adduced. And in so ruling, we do of necessity resolve any doubt as to the truth of all testimony in favor of the plaintiff.

The next requisite step, as stated supra, before liability may be established, is the proof of proximate cause.

The plaintiff's orthopedic surgeon testified that a fracture of the neck of the femur, with the exception of a fracture of a heel bone, is the most difficult in the human anatomy to treat. He stated that, from studies made of a large number of similar fractures, after the original reduction and the placing of the broken bones in apposition, a nonunion resulted in be-tween 20 to 35% of all cases, and that this percentage excluded 10 or 12% of the cases which were fatal. Specifically the doctor said:

"Q. In other words, there is in this type of fracture, and especially in persons from 45 to 55 years or age, there is in this type of fracture, a varying percentage of from 20 to 35% of fractures, where there is an absolute failure of the bones to unite, regardless of what is done by men even the most skilled in their profession, is that right?
"A. That is right.
"Q. Doctor, if you did not get a bony union in the first instance, where these bones were in as good alignment and in as good contact or apposition as you find them to be from the picture, there certainly cannot be any better chance a second time if you observed and tried to follow the same treatment, that would be true, wouldn't it?
"A. There would be less chance."

He then continued his testimony by saying in substance that he knew of no way of preventing an absorption of a callus or bony union which had started following a break, and that, under ordinary circumstances, in from 6 to 8 weeks following a fracture a union is expected, at which time the patient should attempt to move the injured parts; that after an absorption occurs it was his opinion that the surgeon, if it is discovered reasonably soon, should attempt a second bony union by means of rubbing the ends of the fractured bone together or roughing them up, causing them to bleed and exude the matter which forms callus and bony union. In his opinion, however, the chances of securing bony union the second time were about one-fourth as great as were the chances of securing it the first time. Specifically the doctor said:

"Q. Assuming, doctor, that there had been a union or the beginning of a union, that it had become misplaced, and the bones were readjusted and put in place again, what are the chances of a union the second time, compared with the chances the first time? * * *
"A. I think the chances are very much less the second time than the first time.
"Q. Can you tell why not? * * *
"A. Well, after one union becomes absorbed, * * * nature is pretty well worn out; a bony callus may again form, of course, but the chances are much less than in the first place.

"Q. How much less, in your opinion? * * *

"A. I don't think the chances the second time are more than one-fourth as good as they were the first time."

From the testimony of the sole witness on the subject under discussion, it is fair to deduce that had the defendant treated the plaintiff by any of the methods of treatment generally used by the best and most skillful orthopedic surgeons, the probability of recovery was only 25% of the 65 to 80% chance which she had in the first instance, and which latter chance excluded the 10 to 12% which resulted in death.

If the defendant had discovered the disunion by means of further X-rays and had treated his patient in the most skillful manner, the undisputed evidence given by the plaintiff's own witness shows conclusively that her chances of recovery were small.

Does the foregoing furnish sufficient evidence to permit a court to submit to a jury the question of proximate cause?

Evidence is a relative term. It signifies a relation between two facts, the proposition to be established (in this case the proximate cause), and the material evidencing the proposition (the testimony of the witnesses).

It might be argued that the material adduced in this trial, i. e., the prima facie evidence of negligence, is sufficient to create a possibility, a capacity or a tendency. They all express varying degrees of certainty, probability or possibility, and they all belong to the same legal category of thought. Can this be said to be a fair test of the sufficiency of legal proof? Or is the better test the following: Does the evidenciary fact point to the desired conclusion (not as the only rational hypothesis, but) as the hypothesis (or explanation) most plausible or most natural, out of the various ones that are conceivable?

Applying the foregoing test to the facts, the plaintiff has estblished by her own evidence that regardless of any negligence of the defendant after February 6, 1933 (and the proof shows none prior thereto), her chances of recovery were something less than 20%.

Are these facts such as would justify ordinary men of ordinary reason and fairness in affirming the proposition which the plaintiff is bound to maintain? Does justice permit a jury to wander at will and make its own selection as to the specific cause of the injuries sustained? Can reasonable minds reach different conclusions upon the proof of proximate cause by a preponderance of the evidence under the circumstances of this case? Does the less than 20% probability of recovery after a disunion of the broken ends point to the conclusion as the hypothesis most plausible or most natural out of the various ones?

The probability in this case has been mathematically demonstrated. There is no disputed evidence to weigh. The fact of probability has been established and we are of the opinion that it is not sufficient.

"It would be a dangerous doctrine to open the door on such a vital question as proximate cause to the conjecture, inference, and discretion of the jury, when its conclusion, represented by its verdict, must be based upon legal evidence."

Searer v Lower, 25 Oh Ap 328, at p 334. (5 Abs 708).

There must be something more than a showing that the evidence might be consistent with the plaintiff's theory of damages. There must be such evidence as to make that theory reasonably probable—not merely possible.

"In the absence of direct evidence in its support, an allegation that one sustained injuries by reason of the negligence of the defendant is not sustained by proof of circumstances from which the fact that his injuries were so sustained is not a more natural inference than any other."

L. S. & M. S. Ry. Co. v Andrews, 58 Oh St 426. See also, C., T. & V. Ry. Co. v Marsh, 63 Oh St 236.

We therefore hold that it is not sufficient to show that the negligent conduct may have been the cause of the subsequent damage. The evidence must point to the probability that it was. And where the undisputed testimony given by the plaintiff's own witness, for whom the plaintiff vouches, leaves the matter uncertain and shows that any one of several conditions or happenings may have brought about the damage, it is not for the jury to guess between these several causes and find that the negligence of the defendant was the real cause when there is no satisfactory foundation in the testimony for that conclusion. And especially when the undisputed evidence shows an improbability of a casual connection between the claimed negligence and the disability. And if the injured party is

unable to adduce sufficient evidence to show a probable causal connection between the disability and damages and the defendant's negligence, it is only one of the many cases in which the plaintiff fails in her proof, and no mere sympathy for the unfortunate victim of an accident justifies a departure from settled rules of proof resting upon all plaintiffs.

**Patton v Texas & Pac. Ry. Co., 179 U. S. 658.**

In view of the foregoing, the judgment of the Court of Common Pleas will be affirmed.

STEVENS, PJ, and WASHBURN, J, concur in judgment.